UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

SHAMAAH WALLS,             :

                                                                            :   Case No.:

                Plaintiff,

   -against-                                             :   **COMPLAINT**

NEW YORK UNIVERSITY and JOSEPH HAYES,     :

                                                          :   **JURY TRIAL DEMANDED**

          Defendants.

-------------------------------------------------------------- X

Plaintiff, Shamaah Walls ("Plaintiff" or "Ms. Walls"), by and through her attorneys, Harding Mazzotti, LLP, complaining of Defendants, New York University ("NYU") and Joseph Hayes ("Hayes") (collectively as "Defendants"), alleges upon her knowledge and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1.    This is an action to remedy unlawful discrimination, retaliation, and wrongful termination based on Plaintiff's race/color.

2.    Plaintiff seeks declaratory relief, monetary relief, and punitive damages.

**JURISDICTION AND VENUE**

3.    This Court has original jurisdiction over the subject matter of Plaintiff's claims pursuant to 28 U.S.C §1331, as her claims arise under the laws of the United States, namely Title

VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981, ("Section 1981").

4. Venue is proper under 28 U.S.C §1391(b) because the Defendants reside in and do business within the Southern District of New York. Defendant NYU is an educational institution operating within and employing individuals in this jurisdiction, including Plaintiff, during the time period relevant to this Complaint. Additionally, the work performed by Plaintiff during her employment with Defendants was for the institution physically located within the Southern District of New York.

## THE ADMINISTRATIVE REMEDIES REQUIREMENT

5. On August 25, 2021, twenty days after Defendants terminated Plaintiff's employment, Plaintiff filed an inquiry with the Equal Employment Opportunity Commission ("EEOC"). Thereafter, on November 21, 2021, Plaintiff filed a charge of employment discrimination in violation of Title VII with the EEOC, Charge No. 520-2021-04472.

6. Although an investigation was commenced by the EEOC New York District Office, the EEOC transferred Plaintiff's file to its Miami office in January 2023. As a result of that change and the resulting post-transfer stall in the investigation, on April 10, 2023, Plaintiff requested that the EEOC issue a Right to Sue Letter.

7. On April 11, 2023, the EEOC issued a Notice of Right to Sue (Issued on Request) which is annexed hereto as Exhibit A. Plaintiff's Complaint is timely filed within 90 days of receipt of the Right to Sue.

8. No conditions precedent are required before filing claims under 42 U.S.C. § 1981.

## THE PARTIES

9. Plaintiff is an African American female over the age of eighteen who resides in Reston, Virginia.

10. Plaintiff is a former employee of Defendant NYU, and former subordinate of individual Defendant Hayes.

11. Defendant NYU is a private not for profit educational institution located at 726 Broadway, New York, New York 10003, incorporated under the education laws of the State of New York.

12. Defendant Hayes is currently, and at all times herein referenced was, the Assistant Director for Research Operations for Defendant NYU.

13. At all times relevant to this Complaint, Defendant Hayes was Plaintiff's superior as related to her employment with Defendant NYU.

14. Upon information and belief, Defendant NYU employees more than fifteen (15) employees.

15. Upon information and belief, Defendant NYU is an employer within the meaning of Title VII.

## STATEMENT OF FACTS

**The NYU position and Ms. Walls's background**

16. Plaintiff, Ms. Walls, is an African American female.

17. The Plaintiff applied to NYU as a seasoned professional with the skills and requisite knowledge for the job she was hired to do.

18. After receiving her B.S. degree from the University of Maryland with cum laude distinction, the Plaintiff worked for over a decade in college and university positions like the one

at NYU prior to being hired by Defendants. The Plaintiff held positions such as Grants & Contracts Analyst, Research Grants Manager, and Grants and Contracts Administrator prior to her tenure with Defendants. Moreover, in addition to her plentiful relevant work experience, Plaintiff came to the position at NYU with educational courses in grant writing.

19. Ms. Walls was interviewed by various individuals from NYU twice in January 2021. Initially, Plaintiff interviewed before a large panel and then ultimately interviewed individually with Jason St. Germain, Senior Director. Plaintiff had no individual interview with Defendant Hayes.

20. On February 10, 2021, she was offered employment by NYU for the position of Projects Officer/ Grants Specialist in the NYU Office of Sponsored Programs.

21. Ms. Walls' understanding, as confirmed in her offer letter, was that she would report directly to Jason St. Germain, Senior Director, and William Smith, Associate Director.

22. Ms. Walls commenced work in the proffered position on March 1, 2021.

23. Due to NYU's Covid-19 policies when Ms. Walls' employment began, all employees in the NYU Office of Sponsored Programs, including Ms. Walls, were working remotely.

24. Ms. Walls worked remotely throughout her employment with Defendants.

25. If not for the office closure at the time of hiring and continuing throughout her tenure with NYU, Ms. Walls' position would have been as an on-site employee. Ms. Walls had every intention of living in New York City during her employment with NYU.

26. Ms. Walls was prepared to move to New York as soon as NYU permitted employees to return to its offices.

27. Ms. Walls had previously lived and worked in New York City for many years.

28. At any new job and/or place of employment, there is a process and time component to learning the policies and procedures of that specific institution and department. This requires training and mentorship for any new employee.

29. Despite Ms. Walls' expectations that she would report directly to Mr. St. Germain and/or Mr. Smith in accordance with her offer letter, that did not occur. Ms. Walls had very little contact with either of these directors and was instead under the supervision of Defendant Hayes.

**The hostile environment laden with discriminatory comments**

30. Starting immediately after she commenced work for NYU, Ms. Walls attended meetings via Zoom with her then designated direct supervisor Hayes.

31. All of the Zoom meetings between Hayes and Ms. Walls were private with no other attendees. Yet, in response to the EEOC investigation that resulted from Ms. Walls' charge of discrimination, Hayes authored a written statement that he never had a meeting alone with Ms. Walls. This was an outright lie and NYU records will show this claim to be false.

32. The one-on-one meetings between Ms. Walls and Hayes, which occurred almost daily for a period of approximately two weeks after Ms. Walls commenced working for Defendants, involved very little substantive work discussion.

33. Instead, Hayes used the meetings to discuss other employees, complain about them, and to make discriminatory comments to Ms. Walls about her hair and about his perceptions of African Americans.

34. In addition, Hayes talked about bizarre aspects of his personal life. For instance, he would show Ms. Walls pictures of rabbits in his backyard and talk about the many ways he had unsuccessfully tried to get rid of them. He told her that the rabbits had babies and that he was going to "handle" them.

35. Hayes spent most of his time meeting with Ms. Walls discussing other employees in a completely unprofessional and inappropriate manner.

36. For example, Hayes relayed and complained to Ms. Walls about how long it took for employee Suzan Runko to obtain her grants management certification.

37. Hayes commented at length to Ms. Walls on his opinions about employee Jasmine Rodriguez's supposed inability to find a suitable boyfriend.

38. Hayes repeatedly complained to Ms. Walls that NYU Director Kimberly Schulman was too uptight and complained about her constantly addressing and disapproving of his inappropriate comments.

39. Hayes told Ms. Walls that Associate Director Will Smith was an idiot and not fit to be Hayes' boss.

40. Most disturbingly, in addition to the inappropriate and unprofessional gossiping and bad-mouthing of his colleagues and superiors, Mr. Hayes made repeated discriminatory and racially biased comments to Ms. Walls, both about her personally and about black individuals as a race.

41. Hayes commented on Ms. Walls' hair during almost every zoom meeting. Ms. Walls had a natural hairstyle and Ms. Hayes repeatedly referred to it as "nappy". The first time Hayes said this, Ms. Walls corrected him with the intention of using the offensive comment as a teachable moment by stating, "it is referred to as textured hair with different types of coils." Rather than take the correction or understand that Ms. Walls was offended, Hayes seemed to decide this would be his running "joke" with Ms. Walls.

42. There can be no dispute that the term "nappy" is a racially offensive term. Indeed in 2007, when radio host Don Imus used the term "nappy-headed hos" in reference to the Rutgers women's basketball team, his show was permanently canceled.

43. When Zine Magubane, an associate sociology professor at Boston College was asked whether there was a context where the term nappy could be used in a non offensive manner, her response was blunt: "No."

44. Despite Hayes' outrageous belief that using the term nappy to refer to Ms. Walls' hair was their inside joke, Ms. Walls never found it funny or indicated that she did to Hayes. Rather, Ms. Walls was offended every single time Hayes made such comments.

45. During one meeting with Ms. Walls, Hayes played a video of NYU employee Latoya Black's relative being impaled by a jet ski which resulted in her death. Ms. Black and her relative were both black and/or African American. Mr. Hayes gossiped that the employee also lost her boyfriend of fifteen years and had to take six months leave of work as a result and still could not function.

46. Ms. Walls did not know Ms. Black or about her family's tragic loss. She would never have known about this tragic incident or the video had it not been for Hayes. This video was played by Mr. Hayes in the hat of his position at NYU, during working hours, in a meeting with a subordinate that she was required to attend as part of her job, and on an NYU computer.

47. Ms. Walls was shocked and horrified at the video. After showing Ms. Walls the video, Hayes commented, "[y]ou people go on vacation and drink too many 40s," referring to the age-old reprehensible stereotype of African American males as consumers of large 40 ounce bottles of cheap beer.

48. To add to the ordinary horror of being shown this video for what could be nothing other than Hayes' entertainment, Ms. Walls was even more deeply upset and saddened as her own sister had recently passed.

49. Ms. Walls suffered significant depression and anxiety as a result of this disgusting video display by Hayes.

50. Not surprisingly, Ms. Walls became increasingly uncomfortable attending the required zoom meetings with Hayes both because she feared what he might talk about and because she knew he would start the conversation by commenting on how her "nappy" hair looked on that particular day.

51. Eventually, towards the end of their initial period of daily meetings, Ms. Walls found the confidence to tell Hayes that his comments were not welcome. He replied by saying "[y]ou people are just too sensitive." From that point on, Hayes' attitude regarding "mentoring" Ms. Walls changed from "disinterest" to "annoyance" and Ms. Walls felt she was surely being set up for failure.

52. Throughout the weeks of these meetings with Hayes, Ms. Walls was afraid to report the comments by Hayes to anyone else as she was a probationary employee.

53. Hayes had already made very negative comments directly to Ms. Walls about other employees and she was sure that if she complained she would be fired.

54. In addition, Hayes specifically asked Ms. Walls to refrain from repeating any of his comments to Assistant Director Schulman because, as previously mentioned, he considered her "too uptight."

55. To add insult to injury, not only did Hayes act and speak as described, but he did not actually provide any of the requisite or necessary training to Ms. Walls during this period of time.

**Hayes set Ms. Walls up for failure**

56. Eventually, Ms. Walls spoke with Mr. Hayes about her desire for more focused and structured training sessions. In response he stated "nobody trained me when I started" and "it only took me an hour and a half to process an award." Mr. Hayes, evidencing his lack of desire to see Ms. Walls succeed stated, " you just need to figure it out."

57. Approximately two weeks after Ms. Walls commenced work at NYU, Hayes informed Ms. Walls he was turning her over to Jasmine Rodriguez who would be training her going forward.

58. Shortly after the start of the training with Ms. Rodriguez, Ms. Rodriguez announced she was leaving for a week on vacation and Ms. Walls would thereafter be "mentored" by Suzan Runko. Ms. Walls never interacted with Jasmine Rodriquez again.

59. The Runko "mentorship" was also very brief and Ms. Walls was then shuffled back to Hayes by the end of March 2021.

60. Despite this claim that Hayes would begin "mentoring" Ms. Walls again in April 2021, after having had three different supposed mentors in the first four weeks of employment, no additional mentorship was ever provided until Ms. Walls received very late mentorship by Cormac Slevin which began only in July 2021 - a mere few weeks before her termination.

61. During the entire period Ms. Walls was employed by NYU until just weeks before her termination, she never received any review of her progress, verbal, written, or otherwise by

anyone prior to the final weeks before she was terminated when she received some feedback from Cormac Slevin.

62. During the first week of mentoring with Mr. Slevin in July 2021, Slevin asked Ms. Walls, "why is Joe [Hayes] dumping this on you?" in response to noting the specific work assignments Hayes had tasked her with. Slevin told Ms. Walls that Slevin was not upset with her, but he did not understand why she "was given the units she was given."

63. Ms. Walls understood the comment from Mr. Slevin to mean that she was set up to fail with the unit assignments Hayes chose for her and the lack of mentoring.

64. Ms. Walls found the three weeks she spent training with Mr. Slevin to be structured, ordered, and thoughtful, and that Mr. Slevin took the time to explain important elements of the position.

65. During that time Mr. Slevin told Ms. Walls that he spoke with Jason St. Germain and told him that Ms. Walls was progressing well.

66. A July 21, 2021, NYU email from Cormac Slevin confirms that during the short three weeks he worked with Ms. Walls for a mere forty-five minutes a day, four days a week (ultimately 9 hours or less of mentoring), Ms. Walls asked good questions and showed improvements in learning the basics of the role.

67. Mr. Slevin also reported that while working with Ms. Walls, he was able to check her work and that she "clearly showed an understanding of how to review and annotate the proposal record properly." He further noted that when issues were pointed out to Ms. Walls and explained in detail, she would "get it and respond quickly to correct her mistakes."

68. Though ultimately stating that after his nine hours of work with Ms. Walls she was not fully ready to work in the position independently, Mr. Slevin reported that his "overall

assessment [was] that, with enough support, Shamaah would eventually be able to learn the position and be able to work independently in the role."

69. Yet, rather than allow Ms. Walls to continue to work with Mr. Slevin, Hayes ended the mentoring that same week.

70. Pursuant to the documents collected after the fact as part of the EEOC's investigation of Ms. Walls' claims, it is clear that Hayes had commenced his plan to terminate Ms. Walls many weeks earlier and that he never wanted or intended the Walls/Slevin mentorship to succeed or considered it a genuine effort to further Ms. Walls' learning and progress in her employment.

71. Rather, the documents evince that the Slevin/Walls mentorship was suggested and pushed by Jason St. Germain who seemed to clearly realize that Hayes was not providing Ms. Walls with the tools needed to succeed in the job.

72. On June 10, 2021, Mr. St. Germain wrote to Hayes: "In follow up to our discussion at the Senior Staff meeting, I spoke with Amy and a possible extension of Shamaah's probationary period is possible. As mentioned, it's important that you continue to provide feedback to Shamaah on her performance and discuss with her and document items that need to be improved (accuracy, response time, initiative, resourcefulness) in order for her to meet expectations and ask what additional support or resources from us might she need. Also important to probe further in meeting with her the above issues and asking why she's working so late, how she is structuring her workday, etc. Amy and I agreed to revisit extending the probationary period in a month to allow for you to further engage with Shamaah, provide feedback and for her to improve her performance. If you have questions or need additional input or support in the interim, please let me know. Thanks, Jason"

73. A very telling "PS" came at the end of that email: "PS: Does Shamaah continue[1] to have an assigned mentor she can turn to for questions/support (other than you)? If not, it might help to assign someone to her to provide guidance and support for the remainder of the probationary period to support her success."

74. Mr. St. Germain apparently did not receive a response because two weeks later he wrote again: "Just checking in to see if you've connected with Shamaah to probe on the performance concerns you previously shared and what you've learned from those discussions. We need to circle back to Amy in 2 weeks to confirm the need to extend Shamaah's probationary period, so will be interested to know how those conversations have been going.  I also never heard back from you regarding whether or not Shamaah has an assigned mentor. Does she? If not, I'm happy to help resource that from the team if you have not already done so. Given his experience with Nursing and his tenure, Cormac seems a likely choice and am happy to ask him and/or another PO (Mike?) as you see fit. Thanks, Jason"

75. Yet despite both those emails loaded with questions to Hayes and directives, Hayes did nothing in furtherance of Mr. St. Germain's requests. Ms. Walls was not assigned a mentor. Hayes had NO discussions with Ms. Walls about her performance. NO feedback was given. And, last but not least, there was never any discussion or consideration of extending Ms. Walls probationary period, because Hayes had intended to terminate her all along. Not until June 29, 2021 did Hayes respond, and even then, the response answered none of Mr. St. Germain's questions: "Jason, I would appreciate it if you spoke to Cormac about serving as a mentor to Shamaah. I feel Cormac would serve as a good mentor given his history with the clients."

---

[1] Other than one week with Ms. Rodriguez and less than two weeks with Ms.Runko (all in March 2021), Ms. Walls never had a mentor until Slevin on July 1, 2021.

76. The next day, on June 30, 2021, less than five weeks before Ms. Walls termination, Hayes' superior Jason St. Germain wrote to Hayes again about Ms. Walls being mentored by Mr. Slevin and noted "Cormac and I also discussed the need for a more structured approach to training new POs to help assess their readiness prior to being assigned departments--like the approach that's being undertaken now. We should discuss at a future Senior Staff meeting or in a standalone meeting."

77. On July 1, 2021, despite that her ultimate fate had clearly already been predetermined by Hayes, Hayes informed Ms. Walls that she would be mentored by Slevin now. Then, for the first time ever, he mentioned, "you are not yet demonstrating expected proficiency in the PO role." This was a complete surprise to Ms. Walls.

78. Ms. Walls had been set up to fail from the date she told Hayes that she was uncomfortable with his inappropriate conduct in his early "mentoring" meetings with Ms. Walls.

79. Unfortunately, Mr. Slevin's brief mentoring of Ms. Walls was cut short by Hayes when Hayes said he was taking over the mentoring once again. In reality, Hayes was pulling the mentorship because Ms. Wall's fate was already sealed. For weeks he had been soliciting negative feedback regarding Ms. Walls to support a pretextual cause for his already planned termination.

80. The last words Mr. Slevin said to Ms. Walls as their mentoring ended were good luck working with Joe next week."

81. The following week, after cutting off her training sessions with Mr. Slevin, Hayes took no active involvement with Ms. Walls at all. It was clear to Ms. Walls that Hayes had no plans to build on what she had started with Mr. Slevin.

**Ms. Walls' termination**

82. Ms. Walls was terminated on August 5, 2021, only five months after she began her employment with Defendants. The NYU Human Resources ("HR") representative informed Ms. Walls of her termination and told her "[i]t [was] not working out."

83. Ms. Walls asked for an explanation, especially in light of having received positive feedback from her superiors up until that point with the exception of the one aforementioned unexplained comment from Hayes on July 1, 2021. However, the HR representative was unable to provide Ms. Walls with a reason.

84. Ms. Walls was forced to work in a racially discriminatory environment and was terminated due to her superior Joseph's Hayes repulsive and offensive stereotypical beliefs about African Americans and in retaliation for Ms. Walls' informing him that his commentary was not welcome and it should stop.

85. In a final act of stereotypical discriminatory behavior, Hayes, when interviewed by NYU's internal EEO office, stated that Ms. Walls continued to grow "angrier and angrier" and became "agitated" after the fourth or fifth month into her employment." Yet nowhere in his communications with Ms. Walls, Mr. St. Germain, or Mr. Slevin did he ever refer to Ms. Walls as "angry." Not one single email regarding Ms. Walls by anyone at NYU refers to Ms. Walls as "angry."

86. Indeed, 'angry" is yet another age-old racial stereotype that Hayes pulled out of his arsenal of bias. This time though he put pen to paper when casting the stone. "Angry" is unfortunately the stereotype that affects black females in the workplace[2].

---

[2] We examined the angry black woman stereotype and argued that it can affect how others react to expressions of anger by black women at work. Across two studies,we found support for our hypotheses that participants will attribute a black woman's anger to internal factors due to stereotype activation, which then leads to lower performance evaluations and poorer assessments of leadership capabilities. Motro, D., Evans, J. B., Ellis, A. P. J., & Benson, L., III (2021, April 1). Race and Reactions to Women's Expressions of Anger at Work: Examining the

87. In her book *Ar'n't I a Woman?: Female Slaves in the Plantation South*,[3] Rutgers University history professor Deborah Gray White notes that the angry Black woman image is deeply rooted in American culture and dates back to chattel slavery in the United States.

88. Why Hayes found Ms. Walls "angrier and angrier," inferring she was angry to begin with, can only be explained by looking at all of Hayes' interactions with Ms. Walls.

## AS AND FOR A FIRST CAUSE OF ACTION
### As to all Defendants
**Race Discrimination in Violation of Title VII, 42 U.S.C. § 2000e *et seq.***

89. Plaintiff repeats, realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

90. Plaintiff is and was at all times a member of a protected class.

91. Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment by causing Plaintiff to work in an environment where she was discriminated against on account of her race/color.

92. The conduct complained of was unwelcome.

93. The conduct complained of was offensive.

94. The conduct complained of was racially discriminatory in nature and directed at the Plaintiff because of her race.

95. The conduct complained of was sufficiently severe or pervasive to alter the terms and conditions of the Plaintiff's employment by creating an abusive working environment;

---

Effects of the "Angry Black Woman" Stereotype. Journal of Applied Psychology. Advance online publication. http://dx.doi.org/10.1037/apl0000884

[3] White, Deborah G. 1949-. 19871985. *Ar'n't I a Woman?: Female Slaves in the Plantation South*. New York, Norton.

96. The Defendant NYU knew or should have known about the conduct to which Plaintiff claims she was subjected but failed to implement reasonably prompt and appropriate corrective action.

97. Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment by terminating Plaintiff on account of her race/color.

98. Defendants had no legitimate business reason for terminating the Plaintiff and Defendants' claimed reasons were pretextual.

99. Plaintiff suffered severe emotional distress as a result of the hostile work environment and the termination of her employment by Defendants.

100. Plaintiff suffered significant economic loss as a result of the termination of her employment by Defendants.

101. Defendants should also be liable to Plaintiff for punitive damages, since Defendants were intentionally or recklessly indifferent to Plaintiff's rights in terminating her.

102. Defendants engaged in discrimination with malice or with reckless indifference to the right of the Plaintiff to be free from such intentional discrimination.

103. Defendants discriminated in the face of a perceived risk that their actions would violate federal law.

**AS AND FOR A SECOND CAUSE OF ACTION**
**As to all Defendants**
**Retaliation for Protected Complaints in Violation of Title VII 42 U.S.C. § 2000e *et seq.***

104. Plaintiff repeats, realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

105. The Defendants retaliated against Plaintiff in violation of her rights secured by Title VII for opposing what she believed were repeated offensive and discriminatory statements by Defendant Hayes.

106. Defendants terminated Plaintiff due to her opposition to Hayes' discriminatory treatment.

107. Plaintiff suffered severe emotional distress as a result of the termination action.

108. Plaintiff suffered significant economic loss as a result of the termination of her employment by Defendants.

109. Defendants should also be liable to Plaintiff for punitive damages, since Defendants were intentionally or recklessly indifferent to Plaintiff's rights in terminating her.

110. Defendants engaged in discrimination with malice or with reckless indifference to the right of the Plaintiff to be free from such intentional discrimination.

111. Defendants discriminated in the face of a perceived risk that their actions would violate federal law.

**AS AND FOR A THIRD CAUSE OF ACTION**
**As to all Defendants**
**Race discrimination in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981**

112. Plaintiff repeats, realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

113. Plaintiff is and was at all times a member of a protected class.

114. Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment by causing Plaintiff to work in an environment where she was discriminated against on account of her race/color.

115. The conduct complained of was unwelcome.

116. The conduct complained of was offensive.

117. The conduct complained of was racially discriminatory in nature and directed at the Plaintiff because of her race.

118. The conduct complained of was sufficiently severe or pervasive to alter the terms and conditions of the Plaintiff's employment by creating an abusive working environment;

119. The Defendant NYU knew or should have known about the conduct to which Plaintiff claims she was subjected and failed to implement reasonably prompt and appropriate corrective action.

120. Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment by terminating Plaintiff on account of her race/color.

121. Defendants had no legitimate business reason for terminating the Plaintiff and Defendants claimed reasons were pretextual.

122. Plaintiff suffered severe emotional distress as a result of the hostile environment and the termination of her employment by Defendants.

123. Plaintiff suffered significant economic loss as a result of the termination of her employment by Defendants.

124. Defendants should also be liable to Plaintiff for punitive damages, since Defendants were intentionally or recklessly indifferent to Plaintiff's rights in terminating her.

125. Defendants engaged in discrimination with malice or with reckless indifference to the right of the Plaintiff to be free from such intentional discrimination.

126. Defendants discriminated in the face of a perceived risk that their actions would violate federal law.

## AS AND FOR A FOURTH CAUSE OF ACTION
### As to all Defendants
**Retaliation for Protected Complaints in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981**

127. Plaintiff repeats, realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

128. The Defendants retaliated against Plaintiff in violation of her rights secured by 42 U.S.C. § 1981 for opposing what she believed were repeated offensive and discriminatory statements by Defendant Hayes.

129. Defendants terminated Plaintiff due to her opposition to Hayes' discriminatory treatment.

130. Plaintiff suffered severe emotional distress as a result of the termination action.

131. Plaintiff suffered significant economic loss as a result of the termination of her employment by Defendants. Defendants should also be liable to Plaintiff for punitive damages, since Defendants were intentionally or recklessly indifferent to Plaintiff's rights in terminating her.

132. Defendants engaged in discrimination with malice or with reckless indifference to the right of the Plaintiff to be free from such intentional discrimination.

133. Defendants discriminated in the face of a perceived risk that their actions would violate federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, by and through her attorneys, Harding Mazzotti, LLP, demands judgment against all Defendants, and in favor of Plaintiff as follows:

A. Declaring Defendants' conduct to be in violation of Plaintiff's rights under Title VII;

B. Declaring Defendants' conduct to be in violation of Plaintiff's rights under Section 1981;

C. Awarding Plaintiff back pay, front pay, pre-judgment interest, lost fringe benefits, compensatory damages, liquidated damages, punitive damages, costs, and attorney's fees; and,

D. Awarding Plaintiff such other, further, and/or different relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues.

Dated: July 10, 2023
Albany, New York

**HARDING MAZZOTTI, LLP**

By: *Kelly A. Magnuson*
KELLY A. MAGNUSON, ESQ.
P.O. Box 15141
Albany, New York 12212
Tel.: (518) 862-1200
Email: Kelly.Magnuson@1800law1010.com